HUFF, ADMX., APPELLANT, *v.* NEW YORK CENTRAL RAILROAD CO., APPELLEE.*

(No. 2620—Decided April 15, 1961.)

*Messrs. Herbert, Tuttle, Applegate & Britt,* for appellant.
*Messrs. Landis, Ferguson, Bieser & Greer,* for appellee.

KERNS, J. This is an appeal on questions of law from a judgment of the Court of Common Pleas of Montgomery County sustaining a motion of the defendant for a directed verdict at the conclusion of all the evidence in a wrongful death action commenced by Emily Huff, administratrix of the estate of James W. Huff, to recover for damages incurred as the result

_____
*Motion to certify the record overruled (37140), October 11, 1961.

of a collision between an automobile driven by her husband and a train of the New York Central Railroad Company.

The collision occurred at the Sellars Road crossing in Montgomery County shortly after midnight on December 12, 1954. Sellars Road is a highway running in an easterly and westerly direction, and is intersected by two tracks of the defendant, both mainline, running in a northerly and southerly direction. The decedent was travelling east on Sellars Road when the automobile he was driving collided with the left side of the engine of the defendant's passenger train which was northbound on the east track of the railroad.

In traveling east toward the crossing, Sellars Road is straight for some distance. To the left, and approximately one thousand feet north of Sellars Road and west of the tracks was a Frigidaire plant of General Motors Corporation. The decedent had been employed by Frigidaire for about six months, and was proceeding toward home from the plant on the west side of the railroad tracks after completing his work shift at twelve o'clock when the fatal collision occurred. According to the testimony of one of the plaintiff's witnesses, Huff was familiar with the crossing from driving over it going to and from work. Across the tracks and northeast of the crossing was another Frigidaire plant. To the south of this plant in the northeast quadrant was another industrial plant known as the Air Reduction Center. To the southeast of the intersection was an open field, and southwest of the crossing, to the right of the decedent as he approached the tracks, was another industrial plant of the Air Reduction Center. This plant was located 70 to 75 feet south of Sellars Road and 50 to 60 feet west of the railroad tracks which extend south from the crossing for a distance of 1,200 to 1,400 feet before reaching a curve. The plant is completely enclosed by a wire mesh fence which partially obstructs the view to the right when approaching the tracks from the west. There is some evidence that the industrial plants in the area were lighted; and the light on the engine of the northbound passenger train was on dim because of the light from a southbound train of the defendant which was stationary approximately one-half mile north of the crossing.

Approaching the crossing from the west on the date of the

collision, there was a white cross-arm and the letters RR painted on the pavement just west of the entrance to the Air Reduction Center, and a metal crossing sign was on the south berm of the road just east of the painted sign.

In moving closer to the crossing, there was a white line painted across the road about eight or ten feet from the west rail of the double tracks, and a standard cross-buck sign was on the south side of the road just east of the tracks.

The only error claimed by the plaintiff is that the trial court erred in sustaining the motion of the defendant for a directed verdict, and the sole issue to be determined is whether, under the circumstances and physical conditions existing at the time of the collision, the plaintiff's decedent was chargeable with contributory negligence as a matter of law proximately causing his death.

The driver of an automobile when approaching and about to cross over railroad tracks is required, in the exercise of ordinary care, to both look and listen for approaching trains, and to do so at such time and place and in such manner as will make the looking and listening effective. *Detroit, Toledo & Ironton Rd. Co.* v. *Rohrs*, 114 Ohio St., 493; *Pennsylvania Rd. Co.* v. *Rusynik*, 117 Ohio St., 530; *Patton, Admx.,* v. *Pennsylvania Rd. Co.*, 136 Ohio St., 159; *Boles* v. *Baltimore & Ohio Rd. Co.*, 168 Ohio St., 551; *Grove, Admr.,* v. *City Ry. Co.*, 78 Ohio App., 37; *Eastern Motor Dispatch, Inc.,* v. *Pennsylvania Rd. Co.*, 82 Ohio App., 428.

In applying this rule to the evidence, we find that the plaintiff's daughter-in-law, Mrs. Richard Seaman, testified as follows:

"Q. Now when you were there making your investigation of the location a couple of weeks after December 12, 1954, did you stand about on those white lines and west of the railroad tracks and look to the south? A. Yes.

"Q. And could you not see all the way down to where route 25 goes across the overhead over the tracks there? A. You could see an abutment down there, a cement pillar.

"Q. You could see all the way down to that abutment as soon as you got even with the fence there along the Air Reduction Plant, couldn't you? A. Yes.

"Q. After you passed the fence and got closer to the rail-

road tracks, about where those white lines are painted across the highway, couldn't you see down to where the tracks go under route 25? A. Yes—if I was walking.

"Q. But standing still there, you could see all the way down to where the tracks go under route 25 and curve, couldn't you? A. Yes.

"Q. And that was back where those white lines are painted across the road? A. Yes.

"Q. And that was before you reached the railroad tracks at all, wasn't it? A. Yes.

"* * * *

"Q. Could you give us any estimate? You said you estimated from the tracks back to Dryden Road was 1,000 feet. A. I would say it was about 1,400 feet.

"Q. So that standing there on those white lines on Sellars Road west of the tracks, as you looked south, you could look down the tracks for a distance of 1,400 feet. That would be your best estimate? A. Yes."

Although this testimony was based upon observations made during daylight hours, it acquires substantial weight, in the absence of contradiction, when coupled with the testimony of the defendant's witness, Dillard McAfee. McAfee was employed at the Frigidaire plant across the tracks from the plant where the decedent was working, and also completed his tour of duty at 12:00, midnight. Shortly thereafter he approached the Sellars Road crossing moving in a westerly direction. He testified that he heard the whistle on the train: that he stopped his car and parked; that he saw the light of the train to the left of where he was parked; that he could see the headlight of the train burning; and that the whistle "blew all the way across the crossing." McAfee testified further as follows:

"Q. After you stopped there, did you see any other automobiles? A. Yes, I saw an automobile approaching from the other side, that is, the west side.

"Q. And where were you when you saw this automobile approaching from the west side? A. I was parked on the east side of the track.

"Q. Were you already stopped or were you still moving? A. I was stopped.

"* * * *

"A. (Indicating) This is east and this is west and I was parked here and a car was approaching from this side—I would say this is west. I wouldn't say it was all the way up to this building. I would say he was back somewhere west of this building.

"Q. Somewhere west of the Air Reduction Plant? A. Yes.

"Q. Would you be able to give any estimate of the speed of this automobile as it was approaching? A. No sir, I wouldn't say.

"Q. What direction was it coming in? A. He was going east.

"Q. Were his head lights on? A. Yes.

"Q. At the time you saw this automobile coming east towards you from that position over west of the tracks there, was or was not the whistle on the train blowing? A. Yes it was.

"Q. Did you continue to watch that automobile as it approached the railroad tracks? A. I watched until the train got between me and him. I could not say how close he was to the train when the train come between him and myself.

"Q. The train came between you and the automobile? A. Yes.

"Q. But up until the time your view was blocked by the train coming in between you and him, did you continue to watch the automobile? A. Yes sir.

"Q. Did you see any change either in the course or the speed of that automobile as you continued to watch it? A. No sir.

"Q. Could you give any estimate of its speed? A. No sir. I wouldn't say.

"Q. Then after the train came between you and the automobile and blocked your view of the automobile, what happened? A. I heard the sound, the noise."

The cumulative effect of the testimony of these two witnesses lends substantial support to the conclusion reached by the trial court. Since Mrs. Seaman could see down the tracks a distance of approximately 1,400 feet from a point west of the tracks, and since McAfee actually did hear the whistle and actually did see the train from a point across the tracks at some interval before the collision, it reasonably follows that the decedent could have avoided the collision if he had listened when

approaching the crossing or had looked at any point on Sellars Road between the east fence of the Air Reduction Center and the railroad tracks. Furthermore, the locomotive engineer of the train involved in the collision testified that he started to blow the train whistle at a distance of about 1,200 feet from the intersection, and continued to blow it going over the crossing. He testified further that the automatic bell on the locomotive started to ring when leaving the depot at Middletown and was still ringing after the collision.

Much of the evidence in the record, as well as a substantial part of the plaintiff's brief, is directed to the negligence of the defendant. And we have carefully considered the possibility that the negligence of the defendant might have had some bearing upon the question of whether the decedent was exercising ordinary care. But we find no act of negligence or combination of acts of negligence which might alter circumstances so as to render the "look and listen" rule inoperative in this case. This is particularly so since the decedent was familiar with the crossing and the physical conditions attending in the area. Applicable here, in our opinion, is the rule stated as follows in the case of *Pennsylvania Rd. Co.* v. *Moses,* 125 Ohio St., 621:

"In an action founded upon negligence, where the evidence not in dispute clearly shows that the injured party, the plaintiff in the action, was guilty of negligence directly and proximately contributing to his injury as a matter of law, it is the duty of the trial court to direct a verdict in favor of the defendant."

The judgment will be affirmed.

*Judgment affirmed.*

CRAWFORD, P. J., and SHERER, J., concur.